UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| HOSPITAL SERVICE DISTRICT NO. 1 OF TERREBONNE PARISH | * | CIVIL ACTION |
| | * | NO. 22-689 |
| VERSUS | * | |
| | * | SECTION "P" (2) |
| HARTFORD FIRE INSURANCE COMPANY | * | |

**ORDER AND REASONS**

Before me are cross motions for summary judgment in this insurance coverage dispute filed by Hospital Service District No. 1 of Terrebonne Parish against Hartford Fire Insurance Company.  ECF Nos. 37, 39.  The parties timely filed Opposition and Reply Memoranda.  ECF Nos. 39-2, 44, 48.  Both motions raise the same issue:  whether Hartford's insurance policy issued to the Hospital covers loss of income[1] resulting from the Louisiana Department of Health's orders suspending non-emergency procedures during the initial months of the COVID-19 pandemic.

In accordance with the parties' unanimous consent, the Honorable Darrel Papillion referred both motions to the undersigned magistrate judge for resolution pursuant to 28 U.S.C. § 636(c).  ECF No. 56.  After having considered the record, the submissions and arguments of counsel, and the applicable law, Plaintiff's motion for partial summary judgment is DENIED and Defendant's motion for summary judgment is GRANTED for the reasons stated herein.

## I.    **BACKGROUND**

### A.  **Procedural Background**

Plaintiff Hospital Service District No. 1 of Terrebonne Parish ("the Hospital") filed suit seeking contractual and extra-contractual damages against its insurer Hartford Fire Insurance

---

[1] The Hospital disclaims any intent to seek recovery for losses related to clean up, removal, restoration or replacement of contaminated property.  ECF No. 39-2 at 7 n.23.

1

Company ("Hartford").  ECF No. 1.  The Hospital alleges that certain Louisiana Department of Health ("LDH") COVID-19 orders prohibiting all Louisiana hospitals (and thus including the Hospital) from performing non-emergency procedures for several months triggered the Communicable Disease Contamination provision in its Additional Coverage Extension for Healthcare, thereby entitling the Hospital to recover for business interruption losses following the outbreak of COVID-19.  *Id.* ¶¶ 12-16.  Hartford admits that its property insurance policy contains a Communicable Disease Contamination provision but asserts that the claim is not covered and/or is barred.  ECF No. 9.

The Honorable Jane Triche Milazzo[2] bifurcated the issues of coverage and damages, deciding first whether the Hospital is entitled to coverage for alleged COVID-19 business interruption losses under the policy and reserving the issues of damages and penalties for resolution after the coverage determination.  ECF No. 36.  These cross motions for summary judgment followed.

**B.  <u>The Undisputed Facts</u>**

**1.  <u>Louisiana's COVID-19 History</u>**

Louisiana's first presumptively positive COVID-19 case occurred on March 9, 2020, and by March 11, 2020, the Governor issued a proclamation declaring a public health emergency to mitigate the spread of COVID-19.  ECF No. 37-12 at 3.  This proclamation empowered the Secretary of the Department of Health and/or the State Health Officer to take all actions authorized under law to prevent the spread of COVID-19.  *Id.*; *see also* ECF Nos. 37-2 at 3 and 39-34 at 4, Nos. 10-12.  The LDH, through State Health Officer Dr. Jimmy Guidry, then issued a series of orders related to medical and surgical procedures that applied to all Louisiana hospitals, including

---

[2] On June 22, 2023, Chief Judge Brown reassigned this case to Judge Papillion.  ECF No. 38.

orders dated March 18, 2020, March 21, 2020, April 20, 2020, and June 4, 2020.  ECF Nos. 37-13 – 37-16; Nos. 39-5 – 39-8; *see also* Nos. 37-2 at 3-4 and 39-34 at 4, No. 13.  Generally, the initial orders directed the postponement of non-emergent medical or surgical procedures and later allowed the resumption of non-emergent services after implementation of certain safety measures and precautions to further mitigate the spread of COVID-19.[3]  The parties do not dispute that, due to these orders, the Hospital was unable to perform non-emergency medical and surgical procedures from March 18 until June 4, 2020.  ECF Nos. 39-34 at 2 and 44-1 at 4, Nos. 7, 8.

### 2.   The Hospital's COVID-19 Experience

The Hospital treated its first COVID-19 patient on March 11, 2020.  ECF No. 39-3 at 7-8. Each day, the Hospital (like all Louisiana hospitals) reported to the LDH its daily census (i.e., number of available beds and number of admitted COVID-19 patients).  *Id.* at 5-6, 12.  After that date and during the ensuing weeks, the Hospital's tested numerous people, many of those with positive results, and some, but not all, were admitted to the Hospital.  *Id.* at 9-10.  The precise number of COVID-19 patients treated at the Hospital during the relevant time is unclear.[4]  While the Hospital treated numerous COVID-19 positive patients during March 2020, the Hospital's Rule 30(b)(6) witness confirmed that the Hospital had no hospital acquired COVID-19 cases during the March 2020 period.  ECF No. 37-19 at 9; *see also* ECF No. 37-42 at 10-11 (Hospital's expert had

---

[3] *See* ECF No. 37-13 (LDH order directing 30-day postponement of all medical and surgical procedures that can be safely postponed); ECF No. 37-14 (postponing without date medical and surgical procedures except for emergency medical conditions or to avoid further harms from the underlying condition or disease); ECF No. 36-15 (specifying the limited instances in which medical, surgical, and dental procedures may be performed); ECF No. 37-16 (same).

[4] *See* ECF No. 37-19 at 13 (discussing discrepancies between COVID-19 tallies in two documents, one suggesting 45 positive patients and the other suggesting 71 positive patients).  The Hospital's February 19, 2021 chart attached to counsel's September 29, 2021 correspondence to Hartford indicates the Hospital's COVID census ranged from 2 to 41 patients between March 11 – 31, 2020; however, that census number reflects both confirmed and suspected COVID-19 cases.  ECF No. 37-35; ECF No. 37-18 at 51-57.  The Hospital's infectious disease manager Charlotte Boudreaux maintained a daily log of COVID-19 positive results.  Her April 3, 2023 confidential Memorandum to counsel indicates that, in March 2020, the Hospital tested about 191 persons, 71 of whom tested positive for COVID-19 with 63 persons admitted to the Hospital, only 46 of whom tested positive.  ECF No. 37-36; No. 39-4.  Between March 17 and April 2, 2020, eight employees tested positive, three in the dietary department; four of those positive for COVID-19 were admitted to the Hospital.  ECF No. 37-36 at 6.  *See also* ECF No. 39-13.

not received any evidence indicating whether any of the eight employees who tested positive for COVID-19 in March 2020 acquired COVID-19 at the Hospital).  Not until late 2021 or early 2022 did the Hospital report any hospital-acquired COVID-19 cases.  ECF No. 37-19 at 19-20.

As a result of the LDH Orders, the Hospital lost revenue from cancellation or postponement of elective surgeries and reduced ER visits.  ECF No. 37-23 at 6.  In addition, it implemented enhanced and more frequent cleaning/sanitizing procedures, purchased UV lights, modified some treatment spaces, and took other steps to reduce the spread of COVID-19.  *See, e.g.*, ECF No. 39-3 at 18-21; No. 39-15 at 3; No. 44-9 at 8-9; No. 44-10 at 18-21.  Due to COVID-19, the Hospital also used significantly more supplies (e.g., gloves, masks).  *See, e.g.*, ECF No. 44-9 at 10-11.

### 3.  The Relevant Policy Provisions

The parties do not dispute that Hartford Fire Insurance Company issued Policy No. 46 UFJ ZX0065 with a term of April 1, 2019 through April 1, 2020 (the "Policy").  ECF Nos. 37-2 at 1-2 and 39-34 at 4, Nos. 2-6; *see also* ECF No. 37-5 at 2.  The Policy contains an endorsement for Additional Coverage Extensions for Healthcare with a $500,000 limit in any one policy year.  ECF No. 37-5 at 16; *see also* ECF Nos. 37-2 at 3 and 39-34 at 4, No. 8.  The Additional Coverage Extension for Healthcare endorsement contains a Communicable Disease Contamination provision ("CD provision"), which provides, in relevant part:

**B. COMMUNICABLE DISEASE CONTAMINATION**

**Coverage**: When a governmental health authority having jurisdiction over the "Insured Premises" has issued an order regarding an outbreak of a specific communicable disease at an "Insured Premises", we will pay for:

1.  The actual costs that you incur to clean up, remove, restore, or replace contaminated Covered Property when required by the order due to the presence of a specific communicable disease at an "Insured Premises"; and

2.  We also will pay for the actual loss of Business Income or Rental Income you sustain due to the actual impairment of your operations from the requirements

4

of the order during the Period of Restoration at an "Insured Premises", if Business Income or Rental Income is covered under this policy.

Coverage for Business Income or Rental Income will begin 24 hours following the date you begin to clean up, remove, restore or replace contaminated Covered Property and ends on the earlier of:
a. The date you could restore your business operations, with reasonable speed, to the level which would generate the Business Income or Rental Income amount that would have existed if no loss occurred; or
b. 180 days after this coverage for communicable disease contamination begins.

3. We will not pay for the costs to test for or monitor for any communicable disease other than payment for testing or monitoring that is performed during the clean up or removal of the communicable disease.

4. This Coverage does not apply if the presence of the communicable disease:
a. Is caused by or results from a cause of loss that is excluded under this coverage part;
b. Existed prior to the effective date of this policy; or
c. Is not reported to us in writing as soon as possible after you first become aware, or in the exercise of reasonable care, should have become aware, of the presence of the communicable disease.

ECF No. 37-7 at 12.   The policy does not define the term "outbreak" or "regarding."  ECF Nos. 39-34 at 2-3 and ECF No. 44-1 at 11-12, Nos. 12, 14.

Although Hartford issued subsequent policies to the Hospital, the Hospital makes no claim under Policy No. 83 UFJ AJ6U22 issued the following year (April 1, 2020 through April 1, 2021), and the policy issued the year after that did not include CD coverage.[5]

### 4. Hartford Denies the Hospital's Business Income Claim

The Hospital's first notice of loss to Hartford occurred via email on April 15, 2020, citing loss of revenue from elective surgeries and ER visits, extra expenses involving cleaning/sanitizing

---

[5] *See* ECF No. 1 ¶ 6 (referencing policy period of April 1, 2019 through April 1, 2020); *see also* ECF No. 37-1 at 21 n.6 (stating that the second policy contained the same CD coverage); *see also* ECF No. 37-40 at 2-3 (Hartford letter indicating in later year, the Hospital's coverage declaration indicated Healthcare Specialized Coverage provision was "not covered.").  During the February 14, 2024 status conference, Hartford's counsel advised that this letter contained a typographical error and should reflect that the April 1, 2021 through April 1, 2022 coverage declaration omitted the Healthcare Specialized Coverage provision, not the April 1, 2020 through April 1, 2021 policy.

rooms, and other issues related to FEMA's March 24, 2020 Major Disaster Declaration.  ECF No.

37-23 at 2, 6.  In a subsequent conversation, the Hospital attributed its revenue loss to the LDH's

March 19, 2020 mandate on elective and outpatient procedures.  ECF No. 37-24 at 3; *see also* ECF

No. 39-16 at 13 (summarizing Hartford's claim notes indicating that the Hospital's representative

advised that "the hospital has sustained a loss of income and has extra expenses related to the

COVID-19 outbreak").  Hartford denied the claim on May 20, 2020 (with a May 21 second letter

correcting a mistaken policy number reference on the May 20 letter).  ECF No. 37-25 at 4-10; No.

37-26 at 1.

> In its denial, Hartford wrote, in pertinent part:
>
> The order is not in response to an outbreak at a specific Insured Premises and instead pertains to all licensed healthcare facilities in Louisiana.  We also understand that you are incurring additional expenses for terminal cleaning and to retrofit a floor in the hospital in order to keep those with COVID-19 from coming in contact with other hospital patients.  We understand that the additional expenses you are incurring for terminal cleaning and retrofitting a floor in the hospital were not required by a health authority . . . .
>
> The policy that Hartford issued to you contains the PROPERTY CHOICE ELITE COVERAGE FORM (PCE 00 10 01 19) . . . .
>
> * * *
>
> Your policy also contains the following the PROPERTY CHOICE ELITE – COVERED CAUSES OF LOSS AND EXCLUSIONS FORM (PCE 10 10 01 19) . . . .
>
> * * *
>
> Your property policy protects your buildings and business personal property against direct physical loss or damage to property at your Insured Premises caused by a Covered Cause of Loss. Based upon our investigation into your claim, you have not identified any direct physical loss to any property at the Insured Premises.
>
> Your policy also includes the PROPERTY CHOICE ELITE – BUSINESS INCOME COVERAGE FORM (PCE 00 21 01 19) . . .
>
> * * *

Your policy also includes the PROPERTY CHOICE ELITE EXTRA EXPENSE COVERAGE FORM (PCE 00 24 01 19) . . .

* * *

Like the policy's property coverage, Business Income and the Extra Expense coverage requires direct physical loss or damage to property at the Insured Premises that causes an interruption of your business operations. Because there has been no physical loss or damage caused by or resulting from a Covered Cause of Loss to property at a Insured Premises, the Business Income coverage does not provide coverage for your claimed loss of income.

Your policy also includes an additional coverage for Civil Authority . . . .

* * *

We have no information to indicate that a civil authority issued an order as a direct result of a Covered Loss to property in the immediate area of your Insured Premises. A review of Louisiana Department of Health order issued on March 18, 2020 reflects that restrictions have been put in place to slow the spread of COVID-19 and to protect the residents of Louisiana.  The orders are not the direct result of a Covered Cause of Loss to property in the immediate area of your business. Accordingly, this additional coverage is not available for your claimed loss of business income.  Further, to the extent the orders do not specifically prohibit access to your facilities, the coverage does not apply.

Your policy also contains the following exclusion . . .

* * *

COVID-19 is understood to be an irritant or contaminant which threatens human health or welfare.  Further, the virus was not caused by a "Specified Cause of Loss". Accordingly, the pollutant and contaminant exclusion could further bar coverage for the loss.

We note that your policy also contains [an exclusion for "Delay, Loss of Use or Loss of Market"].

 To the extent you are claiming physical loss or physical damage caused by loss of use or loss of market, coverage would be precluded based on the exclusion above.

We have also reviewed other additional coverages in your policy and have determined that they do not apply to your loss. Specifically, your policy contains the PROPERTY CHOICE ELITE ADDITIONAL COVERAGE EXTENSIONS FOR HEALTHCARE (PCE2082 01-19) form . . . .

* * *

> Pursuant to the above, the Communicable Disease coverage requires that a health authority issue an order regarding an outbreak of a communicable disease at an Insured Premises. If that occurs, the coverage pays for the actual costs incurred to clean up, remove, restore or replace contaminated Covered Property as required by that order, as well any resultant loss of Business Income you incur due to the requirements of that order. As we understand it, there has not been an outbreak of COVID-19 at your facilities that has resulted in a health authority issuing an order that requires you to clean up, remove, restore or replace contaminated Covered Property. For this reason, the Communicable Disease coverage does not apply.

ECF No. 37-25 at 4-9.

By letter dated June 18, 2020, the Hospital's insurance broker requested reconsideration of Hartford's denial decision, stating that the insured has advised that it "DID have an outbreak at TGMC . . . [and] was considered a hot spot for the outbreak in Region 3." ECF No. 37-27 at 6-7. In an August 4, 2020 email in follow-up to that request, the Hospital's broker advised that the Hospital "also supports the hot spot for the outbreak as they have reported several COVID-19 workers compensation claims." ECF No. 37-28 at 2; ECF No. 39-16 at 10-11. Hartford reiterated its denial decision via email on August 10, 2020. ECF No. 37-28.

After receiving Hartford's reiterated denial inquiring whether the Hospital received any formal order or directive instructing that it comply with certain procedures other than the general CDC guidelines, the Hospital had its consultant (Lane Sisung) contact LDH's Executive Counsel Stephen Russo to request a specific letter from LDH. ECF No. 39-20 at 4-6. By email dated October 19, 2020, LDH's Russo sent a draft letter to the Hospital regarding LDH's COVID-19 orders, the first sentence of which read: "As a result of the global pandemic related to COVID-19, the Louisiana Department of Health (LDH) issued a series of Healthcare Facility Notices related to medical and surgical procedures." ECF No. 37-29. In response to the draft, the Hospital's consultant and/or attorney Harold Flanagan requested that Mr. Russo revise the first

8

line of the letter to read:  "As a result of the global pandemic related to COVID-19 *and outbreaks at Louisiana hospitals, including Terrebonne General Medical Center,* the Louisiana Department of Health (LDH) issued a series of Healthcare Facility Notices related to medical and surgical procedures."  ECF No. 37-32 (emphasis added); *see also* ECF No. 37-30; No. 37-31.  Mr. Russo revised the letter as requested and in his deposition confirmed that, in writing this letter, he was saying that the orders were written because of outbreaks around the state, not that the order was issued because of anything specific happening at the Hospital as it would have been out of character for him to look into whether there was a specific outbreak at a particular facility.  ECF No. 37-22 at 26-32.

The Hospital relied on LDH's October 2020 letter to support its November 9, 2020, request for reconsideration as well as its September 29, 2021 explanation for its business income loss claim.  ECF No. 37-34 at 1-2; No. 37-35 at 1-2.  By letter dated October 29, 2021, Hartford again denied the claim.  ECF No. 37-40.

## II.   <u>THE SUMMARY JUDGMENT MOTIONS</u>

Hartford seeks summary judgment on the basis that the Hospital's losses suffered as a result of the LDH's statewide orders are not covered losses for three reasons:  (1) The CD contamination provision only applies when the LDH issues a cessation order in response to an outbreak at the particular facility, not simply a statewide order with prophylactic restrictions that impacts an insured; (2) the Hospital had no cases of hospital-acquired COVID-19 before the LDH orders and, although two employees later tested positive, the LDH was not aware of their positive test results or any connection with the Hospital when issuing the orders; and (3) no LDH order required the Hospital to clean-up, remove, restore or replace any contaminated property and the Hospital employed the same cleaning procedures both before and after the LDH Orders.  ECF No. 37-1 at

9-11, 23-33.  Hartford argues that the Hospital's post-event evidence (i.e., LDH's October 2020 letter) created to help support its insurance claim is both improper and insufficient to establish coverage.  *Id.* at 9-10.

In contrast, the Hospital argues that the LDH's orders triggered the policy's business interruption coverage because (a) the Hospital was treating numerous COVID-19 patients and had more than two employees test positive, (b) LDH was aware that the Hospital (like all the hospitals in Louisiana) was treating COVID-19 patients in formulating its orders suspending non-emergency procedures and treatments, (c) the LDH orders suspending non-emergent care were specifically directed to all Louisiana hospitals, which necessarily included the Hospital, and (d) the Hospital was in the middle of the COVID-19 outbreak.  ECF No. 39-2 at 3-6, 12-25.  The Hospital argues that the Policy does not require the LDH to issue its order after an outbreak of COVID-19 at the Hospital, with actual knowledge of the details of the Hospital outbreak, in direct response to that outbreak and specifically declaring that an outbreak had occurred at the Hospital.  *Id.* at 13.  Contrary to Hartford's position, it argues, transmission of COVID-19 at the facility is not a critical element of an outbreak nor does the definition of outbreak require the outbreak occur at a specific location.  *Id.* at 15-18.  The Hospital also argues that the Policy lacked the more stringent causation language found in decisions denying business interruption coverage for COVID-19, and business income coverage is independent of clean-up costs, so the absence of an order directing the hospital to clean-up, remove, restore or replace contaminated property is not required.  *Id.* at 20-22.

In Reply, Hartford reiterates its prior arguments, stressing that the Policy is a property insurance policy that insures against risks occurring at a specific property, not global risks such as the COVID-19 pandemic.  ECF No. 44 at 2.  Hartford argues that the Hospital asks the court to ignore the Policy's language that the government order must be "regarding an outbreak of a

specific communicable disease *at an Insured Premises*." *Id.* at 3.  It argues that the Hospital's efforts to distinguish the numerous cases cited in Hartford's original memorandum fail, and the Hospital has no authority for its position that the outbreak need not occur at the insured premises to trigger business income coverage under the Policy. *Id.* at 4-8.  Hartford likewise argues that, without any clean-up activity, there can be no business income loss coverage. *Id.* at 9-13.  Finally, it argues that outbreak requires two or more cases transmitted at the insured premises, not simply two or more people with the communicable disease who come to the insured premises for treatment. *Id.* at 14-18.

In its Reply, the  Hospital also reiterates its prior arguments (e.g., there was an outbreak of COVID-19 at the Hospital and LDH was aware of it when it issues its orders, "regarding" does not require a subsequent or direct response, covered losses need not center around specified property, business income coverage applies regardless of clean-up or removal efforts) and asks the Court to reject Hartford's argument that a generally applicable order does not trigger policy coverage because it covers other facilities as well as the Hospital.  ECF No. 48 at 1-9.  The Hospital distinguishes the *Ciena* case heavily relied upon by Hartford on the basis that the order at issue in that case was the governor's order much like Governor John Bel Edwards' order that preceded the LDH orders at issue. *Id.* at 5-7.

## III.   APPLICABLE LAW AND ANALYSIS

### A.  Summary Judgment Standard

When a movant shows that there is no genuine dispute of material fact to be decided by the fact-finder and the movant is entitled to a judgment as a matter of law, Rule 56 mandates that summary judgment be issued.[6]  Summary judgment is not precluded by disputes over facts that are

---

[6] FED. R. CIV. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact . . ."); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (stating that summary

not "material"[7] and disputes that are not "genuine."[8]  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[9]  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[10]  Thus, the court must resolve factual controversies in favor of the nonmoving party "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."[11]

When the moving party carries its initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine issue of a material fact.  When, however, the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to non-movant the burden of demonstrating by competent summary judgment proof

---

judgment shall be issued "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law") (citing FED. R. CIV. P. 56(c) (amended 2010)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).

[7] "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 134 (5th Cir. 2010) (citation omitted) ("An issue is material if its resolution could affect the outcome of the action.").

[8] A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *accord Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (citation omitted).

[9] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[10] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075.

[11] *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted).

that there is an issue of material fact warranting trial.[12]  Summary judgment is proper if the party

opposing the motion fails to establish an essential element of their case.[13]

Only evidence—not argument, not facts asserted in the complaint—will satisfy the

burden.[14]  Unsworn pleadings, memoranda or the like are not competent summary judgment

evidence.[15]  Further, a party's version of events that is "blatantly contradicted by the record" is not

entitled to the benefit of any favorable light.[16]  Where the record taken as a whole could not lead

a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.[17]  "If the

evidence is merely colorable . . . or is not significantly probative," summary judgment is

appropriate.[18]

## B. <u>Interpretation of Insurance Policy Provisions</u>

The parties do not dispute that Louisiana law govern the policy.  "An insurance policy is a

contract between the parties and should be construed by using the general rules of interpretation

of contracts set forth in the Civil Code."[19]  Interpretation of an insurance contract is generally a

matter of law.[20]  The court must first consider the parties' intent by examining the words of the

---

[12] *Celotex*, 477 U.S. at 322–25; *see also Moody v. Jefferson Par. Sch. Bd.*, 2 F.3d 604, 606 (5th Cir. 1993); *Duplantis v. Shell Offshore, Inc*., 948 F.2d 187, 190 (5th Cir. 1991).

[13] *See Celotex*, 477 U.S. at 322–23.

[14] *Solo Serve Corp. v. Westowne Assoc.*, 929 F.2d 160, 164 (5th Cir. 1991).

[15] *Larry v. White*, 929 F.2d 206, 211 n. 12 (5th Cir. 1991).

[16] *See Scott v. Harris*, 550 U.S. 372, 376, 380 (2007) (holding plaintiff's selective description of car chase as "controlled" was contradicted by dashcam footage of the high-speed chase); *see also Chambers v. Sears Roebuck & Co.*, 428 F. App'x 400, 40s8 (5th Cir. 2011) (holding self-serving and unsupported statement in affidavit will not defeat summary judgment where record evidence is to the contrary) (citing *In re Hinsley*, 201 F.3d 638, 643 (5th Cir. 2000)).

[17] *See Bickerstaff v. Whitney Nat'l Bank*, No. 96-30231, 1996 WL 595654, at *1 (5th Cir. Sept. 20, 1996); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004) (citations omitted); *see also EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014) ("No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.") (citation omitted).

[18] *Anderson*, 477 U.S. at 249 (citations omitted).

[19] *Mayo v. State Farm Mut. Auto. Ins. Co*., 2003-1801 (La. 2/25/04), 869 So. 2d 96, 99 (citations omitted); *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co*., 93-0911 (La. 1/14/94), 630 So. 2d 759, 763 (citing *Smith v. Matthews*, 611 So. 2d 1377, 1379 (La. 1993)); *see also Q Clothier New Orleans, LLC v. Twin City Fire Ins. Co*., 29 F.4th 252, 256-57 (5th Cir. 2022).

[20] *Bonin v. Westport Ins. Corp*., 2005-0886 (La. 5/17/06), 930 So. 2d 906, 910 (citation omitted).

policy, construing their meaning using their plain, ordinary and generally prevailing meaning unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning.[21]   The "parties' intent as reflected by the words in the policy determine the extent of coverage."[22]

The question of whether an insurance contract is clear or ambiguous is a question of law.[23] When the words of the contract are clear and unambiguous, the court will discern the contract's meaning and parties' intent from the face of the document, without consideration of parol evidence, and no further interpretation may be made in search of the parties' intent.[24]   In other words, an unambiguous contract's meaning and the intent must be sought within the four corners of the document and without explanation or contradiction by extrinsic evidence."[25]   If, after applying the general rules of construction, an ambiguity remains, the ambiguous provision is to be construed against the drafter, or in the context of an insurance contract, in favor of the insured.[26]

An ambiguity exists when the policy provision or term in question can be reasonably construed in two different ways.[27]   An insurance policy "should not be interpreted in an

---

[21] *Q Clothier*, 29 F.4th at 257 (citing *Sims v. Mulhearn Funeral Home, Inc*., 2007-0054 (La. 5/22/07); 956 So. 2d 583, 588–89 (citing LA. CIV. CODE. ANN. art. 2047))*; see also Peterson v. Schimek*, 98-1712 (La. 3/2/99); 729 So. 2d 1024, 1028 ("The role of the judiciary in interpreting an insurance contract is to ascertain the common intent of the insured and insurer as reflected by the words in the policy.") (citing LA. CIV. CODE. ANN. art. 2045); *Doerr v. Mobil Oil Corp*., 2000-0947 (La. 12/19/00); 774 So. 2d 119, 124 ("the initial determination of the parties' intent is found in the insurance policy itself"), *opinion corrected on reh'g*, 782 So. 2d 573 (La. 3/16/01).

[22] *Louisiana Ins*., 630 So. 2d at 763 (citing *Trinity Indus., Inc. v. Ins. Co. of North America*, 916 F.2d 267, 269 (5th Cir. 1990) (internal citation omitted)).

[23] *Cadwallader v. Allstate Ins. Co*., 2002-1637 (La. 6/27/03), 848 So. 2d 577, 580 (citation omitted).

[24] *Q Clothier*, 29 F.4th at 257; *see also* LA. CIV. CODE art. 2046; LA. CIV. CODE art. 1848; *McCarroll v. McCarroll*, 96-2700 (La. 10/21/97), 701 So. 2d 1280, 1286 (noting that parol evidence is inadmissible to vary the terms of an unambiguous contract).

[25] *Bordelon Marine, Inc. v. F/V KENNY BOY*, 780 F. Supp. 2d 497, 502 (E.D. La. 2011) (Vance, J.) (citing *Shocklee v. Mass. Mut. Life Ins. Co*., 369 F.3d 437, 439–40 (5th Cir. 2004)).

[26] *Louisiana Ins*., 630 So. 2d at 764 (citing *Smith*, 611 So. 2d at 1379); *see also* LA. CIV. CODE art. 2056 (providing for adverse construction against the author of the text and the party presenting a standard form contract); *Peterson*, 729 So. 2d at 1028 (noting the purpose of insurance "is to afford the insured protection from damage," and "[i]nsurance contracts, therefore, should be interpreted to effect, not deny, coverage.") (citation omitted).

[27] *Q Clothier*, 29 F.4th at 257 (citations omitted); *see also Capitol Anesthesia Grp., P.A. v. Watson*, 2008-1159 (La. App. 3 Cir. 3/4/09), 7 So. 3d 51, 58 (citing *McCarthy v. Berman*, 95-1456 (La. 2/28/96), 668 So. 2d 721); *see Carrier*

unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion."[28]  Further, a court cannot exercise "inventive powers" to create an ambiguity where none exists or make a new contract when the terms express with sufficient clearness the parties' intent.[29]  Thus, clear and unambiguous policy wording that expresses the parties' intent is enforced as written.[30]

Ambiguous policy provisions, including "equivocal provisions seeking to narrow an insurer's obligation," are strictly construed against the insurer and in favor of coverage.[31]  The strict-construction principle, however, applies only if the ambiguous policy provision is susceptible of more than one reasonable interpretation.[32]  While the insured has the burden of proving that the circumstances constitute a covered claim, the insurer has the burden of proving that any exclusions apply.[33]

### C.  COVID-19 Coverage Cases

When governmental authorities issued COVID-19-related orders substantially reducing and/or closing businesses throughout the country, numerous entities filed claims with their insurers.  Both the Fifth Circuit and Louisiana Supreme Court have issued opinions addressing insurance coverage for business losses relating to the COVID-19 pandemic.  For instance, in *Q Clothier*, making an *Erie* Guess, the Fifth Circuit concluded that financial losses caused by civil

---

*v. Reliance Ins. Co.*, 99-2573 (La. 4/11/2000); 759 So. 2d 37, 43 (ambiguous insurance provisions must be "susceptible to two or more reasonable interpretations.").

[28] *Cadwallader*, 848 So. 2d at 580 (citing LA. CIV. CODE art. 20147).

[29] *Cajun Conti LLC v. Certain Underwriters at Lloyd's London,* No. 22-1349 (La. 3/17/23), 359 So. 3d 922*; see also Cadwallader*, 848 So. 2d at 580.

[30] *Cadwallader*, 848 So. 2d at 580.

[31] *Id.*

[32] *Id.*

[33] *Doerr*, 774 So. 2d at 124; *Mistich v. Weeks*, 2012-150 (La. App. 3 Cir. 7/13/12), 107 So. 3d 1, 5; *see also United Specialty Ins. Co. v. Sandhill Prod. Inc.,* 526 F. Supp. 3d 189, 197 (W.D. La. 2021) (*citing Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 872 (5th Cir. 2009) (internal citation omitted)).

authority orders closing nonessential businesses in response to the COVID-19 pandemic do not fall within the meaning of an insurance policy's coverage for "direct physical loss or damage to the property."[34]  The Louisiana Supreme Court reached the same conclusion when rejecting the argument that the phrase "direct physical loss" was ambiguous.[35]

Not all policy economic loss endorsements, however, are triggered only by "direct physical loss or damage" (i.e., communicable disease coverage extensions).[36]  The Fifth Circuit addressed a business losses claim under a communicable disease coverage provision in *PS Business Management*, stating:

> unlike the other relevant policy provisions, communicable disease coverage is not triggered by "direct physical loss or damage." Rather, the existence of a "communicable disease event" under the policy is what unlocks coverage. . . .
> . . . [T]he policy defines a "communicable disease event" as "an event in which a public health authority has ordered that a location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such location." We agree with the district court that while "COVID-19 is undoubtedly a communicable disease within the meaning of the policy," Plaintiffs have failed to allege the existence of a qualifying "communicable disease event."
>
> Plaintiffs resist this conclusion. While they appear to acknowledge that there was not "an order specific to the insured[ ] location," they stress that, because of the pandemic, various "[s]tate and local government authorities" imposed "restrictions on business operations" and restricted "access to their offices."
>
> But that is not enough. Again, for there to be coverage under this provision, "a public health authority [must] order[ ] that a location be evacuated, decontaminated, or disinfected due to the outbreak of a communicable disease at such location." Plaintiffs have not alleged that any public health order mandated that their premises "be evacuated, decontaminated, or disinfected," let alone that such an order was issued due to an "outbreak" at any of their offices. Accordingly, Plaintiffs have failed to plausibly allege that they are entitled to communicable disease coverage under their policy. *See Dakota Girls, LLC v. Philadelphia Indem. Ins. Co.*, 17 F.4th 645, 651–52 (6th Cir. 2021) (reaching same conclusion in case involving a similar communicable disease coverage provision).[37]

---

[34] 29 F.4th at 257-62; *see also PS Bus. Mgmt., LLC v. Fireman's Fund Ins. Co.*, No. 21-30723, 2022 WL 2462065 (5th Cir. July 6, 2022).

[35] *Cajun Conti,* 359 So. 3d at 922.

[36] *PS Business Management*, No. 21-30723, 2022 WL 2462065 at *3-*4 (5th Cir. July 6, 2022) (noting that communicable disease coverage extension is triggered by communicable disease event, not direct physical loss or damage).

[37] *Id*. at *4.

Most courts to address communicable disease coverage for statewide or citywide COVID-19 closure orders issued to stem the spread of COVID-19 have likewise found no coverage for losses sustained as a result of those orders.  For instance, in *Paradigm Care & Enrichment Center, LLC v. West Bend Mutual Insurance Co.*, 33 F.4th 417, 422 (7th Cir. 2022), the Seventh Circuit affirmed a Rule 12(b)(6) dismissal of a claim involving a communicable disease coverage provision similar to that involved in this case.  In *Paradigm*, the provision covered lost income and extra expense when a government entity shuts down or suspends business operations "due to an outbreak of a communicable disease . . . at the insured premises."[38]  In rejecting plaintiff's argument that the order applicable to the entire state necessarily applied to their facility because it was in the state, the court stated:

> The policies do not define "due to," and the parties dispute how strict of a causal nexus the phrase imposes. *Cf. Mashallah*, 20 F.4th at 320–21 (noting that Illinois generally "favors the efficient-or-dominant-proximate-cause rule in the absence of contrary language in the policy"). But the question of precise degree is irrelevant because "due to" clearly requires some degree of causation between a shutdown order and a communicable disease outbreak "at the insured premises." *See, e.g., Levy v. Minn. Life Ins. Co.*, 517 F.3d 519, 523–26 (7th Cir. 2008). And in no sense were the executive orders at issue here caused by a COVID-19 outbreak at the Centers (or, for that matter, at any other specific location). Rather, the orders were general prophylactic measures taken to slow, suppress, and stop the spread of COVID-19. These same executive orders would have been promulgated verbatim even if the Centers had not existed. Thus, the orders were not issued "due to" conditions at the Centers' premises. *See Dakota Girls, LLC v. Phila. Indem. Ins. Co.*, 17 F.4th 645, 651 (6th Cir. 2021) (noting "no allegation that Ohio's Director of Health had ever even heard of Dakota Girls or the other preschools in this case").[39]

Likewise, in *Salon XL Color & Design Group, LLC v. West Bend Mutual Insurance Co.*, 598 F. Supp. 3d 590, 595-96 (E.D. Mich. 2022), the court interpreted a similar communicable disease provision that provided coverage for "[t]he shutdown or suspension . . . due to an outbreak

---

[38] 33 F.4th at 420.
[39] *Id*. at 423.

of a "communicable disease" . . . at the insured premises . . . ."  The court interpreted the phrase

"due to" as ordinarily used to mean "as a result of" before finding that the executive order closing

non-essential personal care services in the state to mitigate the spread of COVID-19 was not in

response to an outbreak at plaintiff's facility.  The court rejected plaintiff's argument that the order

was in response to COVID-19 at its facility because its facility is within the state, finding that

argument glossed over the policy language requiring the outbreak be *at the insured premises:*

> [W]hen the Communicable Disease coverage provision is read as a whole, it
> becomes evident that it covers losses arising from a communicable disease outbreak
> at the insured premises – not for an outbreak affecting the public at large.

*Id*. at 596.  Even if plaintiff's principal's undiagnosed illness were COVID-19, the court reasoned,

coverage would still be lacking because there was no evidence that the Governor had ever heard

of plaintiff when she issued the closure order.  *Id*. at 597.[40]

Although the policy provision at issue here is slightly different than that in the cited cases,

the court in *Ciena Healthcare Management, Inc. v. Hartford Fire Insurance Co.*, No. 22-438, 2023

WL 3847286 (N.D. Ohio June 6, 2023), addressed the identical policy provision, with the parties

making virtually identical arguments to those raised here.  *Ciena* involved a healthcare facility

---

[40] For additional cases rejecting insurance coverage for losses due to general closure orders, *see Dakota Girls, LLC v. Philadelphia Indem. Ins. Co.,* 17 F.4th 645 (6th Cir. 2021) (rejecting coverage based on state shutdown orders for communicable disease coverage when the government orders a shutdown of business operations "due directly to an outbreak of a communicable disease . . . that causes an actual illness at the [insured] premises . . . ."); *Wild Eggs Holdings, Inc. v. State Auto Prop. & Cas. Ins. Co.,* 48 F.4th 645, 648-49 (6ᵗʰ Cir. 2022) (rejecting loss of business income claim because alleged COVID-19 exposure did not both cause the issuance of statewide orders and the resulting suspension of operations, as necessary under policy terms); *Brandywine Valley Premier Hosp. Group v. Fireman's Fund Ins. Co.,* No. 22-2221, 2023 WL 5044991 (E.D. Penn. Aug. 7, 2023) (finding no coverage under Communicable Disease provision because it "cannot reasonably be read to protect generally against a global pandemic rather than an outbreak localized particularly to [the insured's] immediate vicinity.") (citation omitted); *BSD-360, LLC v. Philadelphia Indem. Ins. Co.,* 580 F. Supp. 3d 92, 102 (E.D. Penn. 2022) (rejecting coverage under communicable disease provision because phrase "outbreak at the insured facility" was meant to protect against localized outbreaks, not a global pandemic; *Theatre Box-San Diego, LLC v. Fireman's Fund Ins. Co.,* No. 22-1001, 2023 WL 2623254, at *5 (S.D. Cal. Mar. 22, 2023) (rejecting coverage because statewide orders were not issued due to outbreak at the insured location).  *Cf. St. Tammany Par. Hosp. Serv. Dist. No. 2 v. Zurich Am. Ins. Co.,* 593 F. Supp. 3d 399, 416-420 (E.D. La. 2022) (granting Rule 12(b)(6) dismissal of claim for coverage under Interruption by Communicable Disease provision because order did not prohibit plaintiff from accessing any part of its facilities as required by policy provision).

where hundreds of residents and employees became ill with COVID-19. *Id*. at *5. Like the Hospital, Ciena argued the communicable disease provision language was ambiguous and that the orders were issued as a result of outbreaks at its facility because it provided infection statistics to the government. *Id*. at *4. Although the court recognized that Ciena had established outbreaks at its facility, it denied coverage on the basis that plaintiff could not establish the necessary casual connection between the shutdown orders and the outbreak at the insured's facility. *Id*. at *5. In rejecting the plaintiff's interpretation, the court wrote:

> Plaintiffs' interpretation effectively removes from the policy the requirement that the facility outbreak must cause the government order. Under Plaintiffs' formulation, the policy would always cover a government order issued in response to any statewide outbreak. Any infections anywhere—not necessarily including those at Plaintiffs' facilities—could have factored into the government order's calculus and contours. But the policy language requires more. It requires that the order be issued "as the direct result of" or "regarding" an outbreak "at an 'Insured Premises.' " (Doc. 19, ¶¶ 18–19). An order regarding a general outbreak occurring statewide is insufficient to trigger the policy.

*Id*. at *6.

As reflected above, most courts to address communicable disease coverage provisions have found that general statewide or citywide orders limiting business operations for COVID-19 do not provide coverage. Recently, however, the First Circuit reversed the Rule 12(b)(6) dismissal of a hospital's claim under a disease decontamination coverage provision in *Lawrence General Hospital v. Continental Casualty Co.*, 90 F.4th 593 (1st Cir. 2024). The relevant policy provision in that case read:

> "Disease Contamination Coverage." This coverage is triggered by an "evacuation or decontamination order at a [covered] location by the National Center [sic] for Disease Control, authorized public health official or governmental authority because of the discovery or suspicion of a communicable disease or the threat of the spread of a communicable disease." (Emphasis omitted.)

*Id*. at 596.  The First Circuit distinguished the Fifth Circuit's decision in *PS Business Management* on the basis that, unlike its plaintiff, PS Business Management failed to describe the specific evacuation or decontamination orders its property was subject to, instead referring generally to statewide executive orders and public health guidance.  *Id*. at 605.

###### D.  **Analysis**

The Hartford Policy at issue is a Special Multi-Flex Business Insurance Policy on the Property Choice Elite Coverage Form that generally covers direct physical loss of or direct physical damage to specified Covered Property at the Insured Premises, with numerous additional endorsements including Additional Coverage Extensions for Healthcare.  ECF No. 37-5 at 3-18, 19; No. 37-7 at 12-14.  Presumably in light of *Cajun Conti* and *Q Clothier*, the Hospital relies solely on the CD contamination provision as its basis for coverage in this case, obviating the need to establish physical loss or damage to trigger coverage.

The CD contamination provision (formally entitled Additional Coverage Extension for Healthcare) is triggered "[w]hen a governmental health authority having jurisdiction over the 'Insured Premises' has issued an order regarding an outbreak of a specific communicable disease at an 'Insured Premises' . . . ."  ECF No. 37-7 at 12.  The undisputed evidence reflects that (a) to stem the proliferation of COVID-19 throughout the state rather than in response to any particular condition at the Hospital, the LDH ordered all Louisiana healthcare facilities to cancel or delay non-emergent treatment; (b) no LDH order specifically focused on COVID-19 cases at the Hospital[41]; (c) LDH officials were not aware of any particular COVID-19 outbreak at the

---

[41] Although the Hospital relies heavily on the October 19, 2020 LDH letter to suggest that the LDH orders were specifically directed to the Hospital, Mr. Russo testified that, when he wrote that letter at the Hospital's request, he did not know whether there was an actual outbreak or not at the Hospital, much less when that outbreak occurred. ECF No. 37-22 at 32.

Hospital[42]; (d) given the prevalence of COVID-19 in March 2020, LDH officials assumed COVID-19 was everywhere in the community including the Hospital; and (e) all area hospitals (including the Hospital) were treating COVID-19 patients in March 2020.[43]

While the parties dispute one another's characterizations and interpretations of the policy terms and the LDH orders, they do not dispute that the LDH is a governmental health authority having jurisdiction over the Hospital,[44] the LDH orders were issued in response to the worldwide COVID-19 pandemic,[45] which included the Hospital but was not issued in response to any reported outbreak of COVID-19 at the Hospital, and COVID-19 is a specific communicable disease.  ECF No. 37-21 at 37-38.  Although the parties dispute the meaning of the terms "outbreak" and "regarding," these terms must be given their plain, ordinary and generally prevailing meaning.[46] An "outbreak" means "[a] sudden increase in the incidence of a disease; an epidemic of infectious disease, esp[ecially] when relatively localized." Outbreak, Oxford English Dictionary (3d ed. 2004).  The word "regarding" means "in reference or relation to; about; concerning."  Regarding, Oxford English Dictionary (3d ed. 2004).

The Hospital has not presented any record evidence to establish that it experienced an outbreak of COVID-19 *at the insured facility* in March 2020.  Rather, the evidence reflects that persons who acquired COVID-19 in the community presented to the Hospital for treatment in March 2020.  ECF No. 39-4 at 1-5.  Further, while the Hospital cites to evidence that certain employees tested positive for COVID-19 in March 2020 and its broker advised that employees had filed worker's compensation claims, the Hospital has provided no documentation to support

---

[42] ECF No. 39-10 at 8 (stating that, at the time the orders were issued, "we were defining outbreak, I think, as more than one case in a healthcare provider.  So I don't know whether there was an actual outbreak or not at -- at specifically Terrebonne.").
[43] ECF No. 39-9 at 6, 15.
[44] ECF Nos. 39-34 at 2, 44-1 at 11, No. 11.
[45] ECF Nos. 37-2 at 4, 39-34 at 5, No. 15.
[46] *Q Clothier*, 29 F.4th at 257 (citations omitted).

the assertion that any employee acquired COVID-19 at the facility (or even worked at the facility during March 2020) or in any way linked any employee's positive COVID-19 status to the facility rather than the community at large.  Indeed, the Hospital has not presented any workers' compensation claim documentation reflecting a hospital-acquired COVID-19 claim during the March 2020 policy period.  Further, the Hospital's Infectious Disease Control Manager Charlotte Boudreaux testified that she was not aware of a single case of hospital-acquired COVID in March 2020, and it was not until end of 2021 or 2022 that she reported a couple of cases of hospital-acquired COVID-19 cases, which dates are past the relevant policy period.  ECF No. 37-19 at 9, 19-20.

The Hospital's contention that community-infected COVID-19 patients who appeared at the Hospital for treatment equates to an outbreak of COVID-19 at the facility improperly disconnects the phrase "outbreak of a specific communicable disease" from the rest of the sentence requiring that the outbreak of the disease occur "at the insured premises."  When properly read together, the "outbreak" must occur at the insured premises, not from people infected from an outbreak elsewhere who show up to the Hospital for medical treatment.  Suppose, for example, that numerous students at the same school are infected with measles from a classmate while at school.  Assume further that several of those students happen to have the same pediatrician, and the sick students visit their doctor's office.  As used in its plain, ordinary and generally prevailing sense, one would attribute an "outbreak" of measles to the school, not the pediatrician's office. Thus, the fact that the Hospital is in Louisiana and people who acquired COVID-19 in the Louisiana community came to the Hospital for treatment in March 2020 simply does not constitute "an outbreak of COVID-19 at the Insured Premises."

Further, there is no evidence that LDH issued any order regarding any outbreak of COVID-19 at the insured premises.  While the Hospital certainly falls within LDH's orders because it is a Louisiana Hospital and thus within the state of Louisiana, the plain language of the LDH orders make clear that the orders were issued statewide to stem the proliferation of COVID-19 in response to the first reported positive case in Louisiana, not "in reference or relation to" or "concerning "any outbreak of COVID-19 *at the Hospital*."  The Hospital's status as a member of the community faced with a global pandemic does not constitute "an outbreak" "at the insured premises," as necessary to trigger coverage under the Policy.

Moreover, because the LDH orders are unambiguous, the court need not look to extrinsic evidence (including Mr. Russo's October 19, 2020 letter) to determine their meaning.  Even if extrinsic evidence were considered, the October 19, 2020 letter, which includes Hospital-specific language added by the Hospital's representatives, is insufficient to create a genuine dispute of material fact regarding whether any LDH order was issued "regarding," in reference or relation to" or "concerning" an outbreak at the Hospital because, as set forth above, the Hospital has not established an outbreak of COVID-19 at its facility in the relevant March 2020 period through any admissible evidence (e.g., workers' compensation filings before the relevant policy period ended on April 1, 2020 or evidence that any COVID-19 positive employee worked during March 2020).

Because I find that there has been neither an "outbreak" "at the facility" in March 2020 nor any order regarding or concerning that outbreak, it is unnecessary to address whether the Hospital must have undertaken any clean up, removal, restoration, and/or replacement efforts in response to same, as necessary to trigger coverage under the CD provision's ¶ B(2).

## IV.   <u>CONCLUSION</u>

Accordingly, for the foregoing reasons,

IT IS ORDERED that the Hospital Service District No. 1 of Terrebonne Parish's Motion for Partial Summary Judgment (ECF No. 39) is DENIED;

IT IS FURTHER ORDERED that Hartford Fire Insurance Company's Motion for Summary Judgment (ECF No. 37) is GRANTED.

New Orleans, Louisiana, this ___22nd___ day of February, 2024.

DONNA PHILLIPS CURRAULT
UNITED STATES MAGISTRATE JUDGE